**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED MINE WORKERS OF AMERICA, et al.,

                 Plaintiffs,

v.                                     CIVIL ACTION NO.  2:06-cv-00892

PANTHER BRANCH COAL COMPANY, et al.,

                 Defendants.

**MEMORANDUM OPINION AND ORDER**

       Pending before the court is the plaintiffs' motion for summary judgment [Docket 18]. Also pending before the court is the defendants' motion for summary judgment [Docket 16]. For reasons set forth below, the court **GRANTS** the plaintiffs' motion. The court **GRANTS in part** and **DENIES in part** the defendants' motion.

**I. Background**

       Since the late 1940s, health and retirement benefits for coal miners have been the subject of collective bargaining agreements between the United Mine Workers of America (UMWA) and the Bituminous Coal Operators' Association (BCOA). *Eastern Enter. v. Apfel*, 524 U.S. 498, 505-506 (1998). Over the years, health benefits were provided by a series of trust funds supported by employers who were signatories of National Bituminous Coal Wage Agreements (NBCWAs). The 1974 NBCWA liberalized benefits and eligibility by providing lifetime health benefits for retirees, disabled mine workers, spouses, and surviving spouses. *Id.* at 510. The increase in benefits, combined with other factors, resulted in financial problems for the 1974 Benefit Plan. *Id.* at 511. As

a result, the 1978 NBCWA "assigned responsibility to signatory employers for the health care of their own active and retired employees." *Id.* at 511.[1]

Subsequent NBCWAs, including those at issue in this case, retain the requirement that signatory employers provide lifetime health benefits for employees and retirees. In particular, Article XX, Section (c)(3)(i) of the 2002 NBCWA states that "[e]ach signatory Employer shall establish and maintain an Employee benefit plan to provide, . . . health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer and who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act." (2002 NBCWA, Art. XX, Section (c)(3)(i), Stip. R. 4.) Put more simply, a signatory employer who was a pensioner's last, i.e., most recent, classified signatory employer is responsible for that person's health and related benefits.

The pensioner, or retiree, in this case is Edward Alderman of MacArthur, West Virginia. (Compl. ¶ 5). Mr. Alderman's career in the coal mining industry began in 1972 and continued until 1996. (Stip. R. 191-94.) During this time, Mr. Alderman worked for a number of different coal mining companies, including the defendant in this case, Panther Branch Coal Co., which did business as Long Branch Energy Co. ("Long Branch"). (*Id.*) Mr. Alderman began work at Long Branch in November 1992 and was laid off in December 1995. (Stip. R. 120.) Under the collective bargaining agreement in force at the time, he was entitled to "panel rights" with Long Branch upon

---

[1] For more history regarding coal collective bargaining agreements, see *Easter Enter. v. Apfel*, 524 U.S. 498 (1998); *District 17, UMWA v. Brunty Trucking Co.*, 269 F. Supp. 2d 702 (S.D. W. Va. 2003) (Goodwin, J.).

being laid off.[2] In January 1996, Mr. Alderman obtained employment with Maple Meadow Mining. (Stip. R. 120.) The conditions at Maple Meadow caused Mr. Alderman's rheumatoid arthritis to flare up. (Stip. R. 170-72.) Because of this, Mr. Alderman filed an application for social security disability benefits in May 1996 and quit his job at Maple Meadow on May 23, 1996. (Pls.' Mem. 6 [Docket 19]; Defs.' Mem. 2 [Docket 17].)

On July 8, 1996, Long Branch recalled Mr. Alderman in accordance with his panel rights. (Stip. R. 120.) At the time of the recall Long Branch was unaware of Mr. Alderman's medical condition or that he had applied for Social Security disability benefits. (Defs.' Mem. 2.) Mr. Alderman reported to work following the recall, but his arthritis limited him; he worked only 15 out of 44 scheduled work days from July 9, 1996, to August 31, 1996. (Pls.' Mem. 6; Defs.' Mem. 2.) On August 20, 1996, the Social Security Administration advised Mr. Alderman that his application for disability benefits had been approved and that it deemed the onset of his disability to have occurred on May 12, 1996, a time when he was still employed by Meadow Mining. (Stip. R. 123-26.) Mr. Alderman began receiving sickness and accident benefits from Long Branch on September 1, 1996, and he was laid off again on September 29, 1996. (Defs.' Mem. 2; Stip. R. 116.) Long Branch provided him with health benefits for one year after the layoff pursuant to the collective bargaining agreement and then terminated his benefits. (Defs.' Mem. 2.) Mr. Alderman has not worked for a coal company since this layoff.

---

[2] Under the 1993 NBCWA, signatory employers were required to fill vacant positions by recalling employees from a panel made up of those who had previously been laid off. In order to be placed on a panel, an employee filled out a form that listed his mining experience, qualifications, and particular type of job to which he wishes to be recalled. (1993 NBCWA, Art. XVII, Sections (c) - (h); Ex. 1.)

When Mr. Alderman's post-layoff health benefits ended, he contacted the UMWA Health and Retirement Funds ("Funds") regarding his eligibility for additional health benefits. (Pls.' Mem. 6.) By letter dated November 4, 1997, the Funds notified Mr. Alderman that he needed to contact his last signatory employer to determine whether he was eligible for benefits as a disabled employee. (Stip. R. 124.) The Funds identified Long Branch as the last signatory employer. (Stip. R. 124.) The Funds also advised Mr. Alderman that he would be eligible to receive a pension when he reached age 55. (Stip. R. 124.) Long Branch refused to provide Mr. Alderman with "disabled employee" health benefits, allegedly because he was not disabled due to a mine-related injury.

On December 8, 1997, Mr. Alderman filed a request for Resolution of Dispute (ROD) pursuant to the dispute resolution provisions of the NBCWA. (Stip. R. 125.) The ROD was withdrawn after the Funds' Eligibility Service Department determined on June 24, 1998, that Mr. Alderman should look to Maple Meadow, not Long Branch, for coverage as a disabled employee. (Stip. R. 134.) The stipulated record does not indicate why the Funds decided that Maple Meadow was the employer to which Mr. Alderman should look for disabled employee health benefits. The 2002 Employer Plan, however,  states that the relevant employer for disability benefits purposes is the employer for which an employee was working when he became disabled. (Art. II, Section C, 2002 Employer Plan, Stip. R. 80, (stating that health benefits will be provided to any employee who, among other things, *became disabled* after December 6, 1974,  *while in classified employment with the Employer*) (emphasis added).) For retiree health benefits, on the other hand, an employee must look to his last signatory employer. (*See* Art. XX, Section (c)(3)(i), 2002 NBCWA, Stip. R. 4.)

In June 2004, approximately six years after the dispute over disabled employee benefits, Mr. Alderman turned 55 and sought retiree status and a pension. (Pls.' Mem. 8; Defs.' Mem.  2.) By a

letter dated March 25, 2005, the Funds notified Mr. Alderman that he was eligible for a retirement

pension. (Stip. R. 136.) The Funds also stated that Mr. Alderman might be eligible for retiree health

benefits, and that he should contact "the last signatory company that employed you in a classified

job" for information about his eligibility for these benefits. (Stip. R. 136.) The Funds' records

indicated that Long Branch was Mr. Alderman's last signatory employer. (Stip. R. 136.)

Long Branch refused to provide benefits. (Pls.' Mem. 8.) In response, Mr. Alderman filed

a ROD seeking retiree health benefits from Long Branch on May 20, 2005. (Stip. R. 139; Pls.' Mem.

8.) Long Branch submitted a Statement of Position on July 19, 2005, denying that Long Branch was

required to provide Mr. Alderman retiree health benefits because 1) "Long Branch Energy was not

the employer who last employed Mr. Alderman in a 'classified job'"; 2) Mr. Alderman engaged in

fraudulent and inequitable conduct; and 3) Mr. Alderman breached a fiduciary duty that offset his

claim for coverage. (Stip. R. 141.) Long Branch was notified that the assignment of a pensioner's

last signatory employer could not be challenged in the ROD process, but must be raised before the

Funds' Eligibility Service Department. (Stip. R. 148.) Long Branch's pension eligibility challenge

raised the same arguments as its ROD Statement of Position. (Stip. R. 150-56.)

The Pension Eligibility Service Department rejected Long Branch's challenge and instead

found that Long Branch was Mr. Alderman's last signatory employer. The decision was based on

the fact that the Funds' records indicated that Long Branch employed Mr. Alderman from July 1996

to September 30, 1996, and that no coal company reported Mr. Alderman as having worked for them

after September 30, 1996. (Stip. R. 157.) In an opinion issued on February 15, 2006, the Trustees

of the Fund held that Long Branch was required to provide retiree health benefits coverage for Mr.

Alderman, effective July 1, 2004, consistent with the terms of the 2002 Employer Benefit Plan.

(Stip. R. 163.) The Trustees' basis for so holding was that the Pension Eligibility Service Department found Long Branch to be the last signatory employer and that Mr. Alderman met the eligibility requirements of Article II, Section B of the 2002 Employer Benefit Plan. (Stip. R. 163.) The Trustees did not address Long Branch's argument that Mr. Alderman forfeited his right to health benefits because he fraudulently claimed to be physically able to perform his job and failed to inform Long Branch of his application for disability benefits; the Trustees stated that they did not have jurisdiction to address issues regarding hiring and recalls. (Stip. R. 163.) As for Long Branch's argument that its damages for Mr. Alderman's alleged breach of fiduciary duty offsets his claim for health benefits, the Trustees pointed out that "[t]here are no facts in this case that indicate that the Complainant [Mr. Alderman] is a fiduciary, and there is no provision in the Employer Benefit Plan providing for offset." (Stip. R. 163.)

Despite the Trustees' finding in the ROD process, Long Branch has not provided Mr. Alderman with retiree health benefits. (Compl. ¶ 7 [Docket 1].) As a result, the plaintiffs in this case, Mr. Alderman and the UMWA, filed this lawsuit on October 20, 2006. Mr. Alderman's claims are for enforcement of the Trustees' February 15, 2006 opinion and for benefits under section 502 of the Employee Retirement Income Security Act of 1974 (ERISA).(Compl. ¶ 18-29, 32-35.) The UMWA asserts that Long Branch has breached the 1993, 1998, and 2002 NBCWAs. (Compl. ¶ 30-31.) The plaintiffs seek 1) confirmation and enforcement of the Trustees decision awarding Mr. Alderman benefits from Long Branch; 2) a declaration that Long Branch has breached the NBCWAs and violated ERISA; 3) compensatory damages for the medical expenses incurred by Mr. Alderman; 4) an injunction restraining Long Branch from again refusing to provide Mr. Alderman retiree health benefits; and 5) attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g). (Compl. ¶ 1-9, p. 9.) The

defendants, Panther Branch Coal Co., Long Branch Development Co., and Long Branch Energy Co. ("Long Branch"), deny the plaintiffs' allegations. (Ans. by Panther Branch Coal Co. [Docket 8].)

On May 23, 2007, the parties filed cross motions for summary judgment [Docket 16 & 18]. The defendants argue that the plaintiffs' claims fail as a matter of law because Long Branch Development Co. is not a proper party to the lawsuit and because "Mr Alderman is equitably barred from receiving benefits from Long Branch." (Defs.' Mem. 4.) The plaintiffs' seek summary judgment on apparently all the counts in their complaint.

## II. Jurisdiction

The court has jurisdiction of this matter pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, Section 502 of ERISA, 29 U.S.C. § 1132(e), (f), and, more generally, 28 U.S.C. § 1331.

## III. Standard for Summary Judgment

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court will not, however, "weigh the evidence and determine the truth of the matter." *Id.* at 249. Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Id.* at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential

element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

**IV. Discussion**

      A. The Defendants' Motion for Summary Judgment

          *1. Dismissal of Long Branch Development Co.*

The defendants' move for summary judgment on two grounds, one procedural and one substantive. As for the former, the defendants assert that Long Branch Development Co. is not a proper party to the lawsuit because it neither signed the 1993 NBCWA nor employed Mr. Alderman. (Defs.' Mem. 4.) Rather, it was Long Branch Energy who engaged in these activities. (Defs.' Mem. 4; Ans. ¶ 5-9.) The plaintiffs concede that it was Panther Branch Coal Co., doing business as Long Branch Energy, that signed the NBCWAs and employed Mr. Alderman; thus, the plaintiffs do not object to the dismissal of Long Branch Development Co. (Pls.' Resp. 1 [Docket 20].) In light of these facts, the court **FINDS** that Long Branch Development Co. is not a proper party to this lawsuit. The court **GRANTS in part** the defendants' motion and **DISMISSES** Long Branch Development Co. from the case.

          *2. Equity as a Bar to the Plaintiffs' Claims*

In support of their motion for summary judgment, the defendants argue that equity should prevent Mr. Alderman from collecting health benefits from Long Branch. (Defs.' Mem.  4.) In particular, the defendants contend that the only reason that Long Branch was Mr. Alderman's "last signatory employer" was because of his "disingenuous conduct related to his ability to work at the time of his recall." (Defs.' Mem.  7.) The defendants assert that Mr. Alderman obtained his job at Long Branch with "unclean hands" because he "presented himself to Long Branch upon recall as being able to safely and competently work" when, in fact, he left his prior job for medical reasons and had applied for Social Security disability benefits before being recalled. (Defs.' Mem.  in Opp. 1, 3 [Docket  21].) According to the defendants, had Mr. Alderman been honest about his "medical condition and inability to work," Long Branch would not have been obligated to recall him and would not have tried to put him to work. (Defs.' Mem.  5.) The defendant cites cases where the plaintiff was barred from obtaining benefits due to his misrepresentations, the "after-acquired evidence doctrine," and the doctrine of judicial estoppel. (Defs.' Mem.  6.)

The plaintiffs attempt to distinguish the instant case from those cited by the defendants by arguing that what Mr. Alderman did or did not say had nothing to do with his right to benefits. (Pls.' Mem. in Opp. 3.) The plaintiffs also maintain that Mr. Alderman did not fraudulently induce Long Branch into employing him because his recall was based on his panel rights. (Defs.' Mem.  in Opp. 3.) Finally, the plaintiffs assert that there is no evidence that Mr. Alderman made any misrepresentation that would bar him from obtaining benefits. (Defs.' Mem.  in Opp. 3.)

The Employee Retirement Income Security Act of 1974 (ERISA) "is a 'comprehensive' and closely integrated regulatory system' that is 'designed to promote the interests of employees and their beneficiaries in employee benefit plans.'" *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d

253, 257-58 (4th Cir. 2005) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990)).

To facilitate these goals, the ERISA preemption clause, 29 U.S.C. § 1144(a), protects the

administrators of employee benefit plans from conflicting and inconsistent state and local regulation.

*Id.* at 258. Specifically, ERISA "supersede[s] any and all State laws insofar as they . . . relate to any

employee benefit plan." 29 U.S.C. § 1144(a). The term "State law" includes not only statutes, but

also common law causes of action such as claims for breach of contract. *See* 29 U.S.C. § 1144(c)(1);

*Gresham*, 404 F.3d at 258.

      The preemption of state law by ERISA left gaps in the law that Congress intended courts to

fill by developing federal common law. *United McGill Corp. v. Stinnet*, 154 F.3d 168, 171 (4th Cir.

1998.) Courts may not, however, "create remedies under the federal common law beyond those

Congress has seen fit to enact." *Provident Life & Accident Ins. Co. v. Cohen*, 423 F.3d 413, 425 (4th

Cir. 2005). Consistent with this limitation, the Fourth Circuit has refused to create federal common

law causes of action for negligent misrepresentation or breach of fiduciary in the ERISA context.

*Rego v. Westvaco Corp.*, 319 F.3d 140, 148 (4th Cir. 2003). The court reasoned that ERISA already

created causes of action covering this type of conduct. *Id.*

      A related topic is the extent to which ERISA permits defendants to assert equitable,

common-law defenses to plaintiffs' claims for benefits. Although there is not an abundance of case

law on the issue, several courts in other jurisdictions have held that federal common law allows for

the assertion of equitable defenses in ERISA cases. *Shipley v. Ark. Blue Cross & Blue Shield*, 333

F.3d 898, 903 (8th Cir. 2003) ("[F]ederal common law allows for the equitable rescission of an

ERISA-governed insurance policy that is procured through the material misstatements or omissions

of the insured."); *Security Life Ins. Co. v. Meyling*, 146 F.3d 1184 , 1190 (9th Cir. 1998); *McBride*

*v. Hartford Life & Accident Ins. Co.*, No. 05-6172, 2007 U.S. Dist. LEXIS 16917, *59 - 64 (E.D. Pa. Jan. 29, 2007) (citing cases); *Meyer v. Berkshire Life Ins. Co.*, 128 F. Supp. 2d 831, 841 (D. Md. 2001) (considering but rejecting equitable defenses); *Chitkin v. v. Lincoln Nat'l Ins. Co.*, 879 F. Supp. 841, 853 (S.D. Cal. 1995). The rule allowing a defendant to use as a defense a purported beneficiary's misrepresentations accords with the "settled principle of contract law that 'wherever the circumstances are such as to warrant an action for deceit for inducing a person to enter into a contract, they will certainly warrant avoidance or rescission of the bargain.'" *Nash v. Trustees of Boston Univ.*, 946 F.2d 960, 965-66 (1st Cir. 1991) (quoting 12 Williston on Contracts § 1487 (1970)).

That the defendants may assert equitable defenses does not, however, changed the fact that there is no evidence that Mr. Alderman made a misrepresentation to Long Branch, let alone a material one that would justify ignoring that Long Branch was Mr. Alderman's last signatory employer. Under federal common law, "[a] misrepresentation is a statement of fact that is untrue or a failure to disclose a fact in response to a specific question." *Shipley*, 333 F.3d at 904. Here, the defendants have not pointed to anything in the record demonstrating that Mr. Alderman made an untrue statement of fact. Nor have the defendants shown that Mr. Alderman failed to disclose his medical problems to Long Branch in response to a specific question. The only evidence on the subject in the administrative record is Mr. Alderman's statement before the Trustees in the ROD proceedings that:

> I don't feel that I was fraudulent with Long Branch because I did not sign any paper nor was I asked if I could preform [sic] my duties. . . . I didn't falsify any information to LB. these answers are to the best of my memory. I sure don't remember asserting or signing any form stating this. If I would have been asked any of these questions I would have answered them truthfully but again I was not "asked." What document do they have that I gave false information on?

(Stip. R. 172-78.) The defendants did not provide any evidence to refute Mr. Alderman's assertions at the time of the ROD, and have not done so now.

Rather than providing direct evidence of a misrepresentation, the defendants have relied on a sort of implied misrepresentation theory. That is, the defendants argue that it was inconsistent, and ultimately inequitable, for Mr. Alderman to leave Maple Meadow for medical reasons and apply for Social Security disability benefits, and then, a few months later, "present[] himself to Long Branch upon recall as being able to safely and competently work - a presentation which was not accurate, given his inability to work once he accepted the job." (Defs.' Mem. in Opp. 3.) There are two problems with this argument. First, the presentation was not as inaccurate as the defendants' make it out to be - Mr. Alderman was able to, and did, work at Long Branch after his July 1996 recall. It is true that he was not able to work even half the time he was scheduled, but this does not make his appearing on recall a material misrepresentation. Second, at the time he was recalled Mr. Alderman had not yet learned that he was going to be awarded Social Security disability benefits; Mr. Alderman did not know he was disabled for the purposes of Social Security when he presented himself upon being recalled.

Even if the court were to hold that Mr. Alderman misrepresented to Long Branch his medical condition and ability to work, the court would not grant the defendants the relief they seek because Mr. Alderman did not induce Long Branch into entering into an employer benefits plan. In the defendants memoranda, they state that "ERISA permits the rescission of benefits, policies and plans when the basis for the inducement of entering into the plan was fraudulent." (Defs.' Mem. 5; Defs.' Mem. in Opp. 2.) There is no indication, however, that Long Branch entered into the Employer Plan because of Mr. Alderman's alleged misrepresentations. Likewise, Mr. Alderman's

conduct in 1996 did not give rise to his eligibility for health benefits; Mr. Alderman became eligible for benefits because he put in his time in the coal industry pursuant to the provisions of the 1974 Pension Plan, 2002 NBCWA, and 2002 Employer Plan. Nor did Mr. Alderman induce Long Branch into rehiring him and becoming his last signatory employer - as noted previously, Mr. Alderman's panel rights were established when he was laid off in December 1995.

The lack of inducement distinguishes the present situation from the cases cited by the defendants. In *Nash v. Trustees of Boston Univ.*, 946 F.2d 960 (1st Cir. 1991), the court upheld the district court's holding that the plaintiff's "fraudulent inducement of the [early retirement] agreement obviated the need to consider the ERISA claims predicated on the agreement." *Nash*, 946 F.2d at 963, 967. In that case, the plaintiff, while negotiating an early retirement package with his employer, represented that he was no longer a candidate for a certain job when in actuality he had orally accepted that job. *Id.* at 962. There was ample evidence in that case that the plaintiff's employer would not have entered into the early retirement agreement had the plaintiff not concealed his newfound employment. *Id.* at 963. Unlike that case, Mr. Alderman made no express misrepresentations to Long Branch and his employment with them on recall was based on panel rights established independent of the events in 1996. Similarly, *Ellenburg v. Brockway Inc.*, 763 F.2d 1091 (9th Cir. 1985), involves facts quite different from those in this case. There, the district court held that because the plaintiff lied about his date of birth in order to obtain early retirement benefits, equity prevented him from recovering those benefits. *Ellenburg*, 763 F.2d at 1093-94, 1097. Again, there is no indication that Mr. Alderman kept quiet about his medical condition and application for disability benefits to induce Long Branch to hire him and become his last signatory employer. The defendants also find support in the "after-acquired evidence" doctrine described

-13-

in *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995). (Defs.' Mem.  6; Defs.' Mem. in Opp. 2.) According to the defendants, the case stands for the proposition that "an employee suing an employer for workplace discrimination is barred from recovering damages for future economic loss if his own misconduct, discovered after the discharge, would have resulted in his discharge regardless or a decision not to hire him in the first place." (Defs.' Mem.  6.) On its face, it is apparent that the after-acquired evidence doctrine is not applicable here - this case does not involve a suit for workplace discrimination. Moreover, *McKennon* Court noted "[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands." *McKennon*, 513 U.S. at 360. The defendants have not offered any evidence that Mr. Alderman engaged in reprehensible conduct.

The defendants also cite *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), and the doctrine of judicial estoppel, arguing that "an employee who sues his employer for discrimination under the Americans with Disabilities Act can be estopped from asserting that he is a qualified individual with a disability covered under the Act if he asserted to the SSA that he is totally disabled from working for the purposes of recovering SSDI benefits." (Defs.' Mem.  6-7.) The Court in *Cleveland* did note the tension between the plaintiff's assertion, for Social Security purposes, that she was too disabled to work, and her assertion, for purposes of the ADA, that she could with reasonable accommodation perform the essential functions of her job. *Cleveland*, 526 U.S. at 797-89. More importantly*, however,* the Court recognized that "if an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Id.* at 805.  At the time Mr. Alderman was recalled by Long Branch, he had applied for, but not been awarded, Social Security disability benefits; thus, this is

-14-

not a case where judicial estoppel is warraned. This is especially true given that the Fourth Circuit has described "bad faith" as the determinative factor in assessing whether judicial estoppel should be applied,. *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007).

For the reasons set forth above, the court **FINDS** that the defendants have not demonstrated that equitable principles bar the plaintiffs' claims. As a consequence, the court **FINDS** that the defendants are not entitled to judgment as a matter of law and **DENIES in part** the defendants' motion for summary judgment.

B. The Plaintiffs' Motion for Summary Judgment

The plaintiffs "move the Court to enter summary judgment in favor of the Plaintiffs and against the Defendants Panther Branch Coal Company and Long Branch Energy, and to enforce the arbitration decisions of the Trustees of the UMWA Health and Retirement Funds." (Pls. Mot. Summ. J.) The court  assumes that the plaintiffs are moving for summary judgment on all three of their counts. The plaintiffs submit that there are no genuine issues of material fact. (Pls.' Mem. 10.)  In response to the plaintiffs' motion, the defendants reassert the equitable arguments that this court rejected above. (Defs.' Mem. in Opp.)

Article XX, Section (e)(5) of the 2002 NBCWA states that all "[d]isputes arising under this Agreement with regard to the Employer benefit plan . . . shall be referred to the Trustees. The Trustees shall develop procedures for the resolution of such disputes. In the event the Trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties." (Art. XX, section (e)(5), 2002 NBCWA, Stip R. 9.) Because of this provision, the claims in this case hinge on one issue - whether the February 15, 2006 decision of the Trustees that said that Long Branch is required to provide health benefits for Mr. Alderman - is valid and enforceable. If it is,

-15-

then Long Branch's failure to abide by the binding decision and furnish health benefits constitutes a breach of the NBCWAs to which Long Branch was signatory. It would also mean that Long Branch would be liable to Mr. Alderman under ERISA, which allows a participant or beneficiary of a plan "to recover benefits due to him under the terms of the his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

The plaintiffs characterize the Trustees' decision as an arbitration award and argue that this court should apply the highly deferential standard of review used in *Upshur Coals Corp. v. United Mine Workers of America*, 933 F.2d 225 (4th Cir. 1991). (Pls.' Mem. 12.) Other courts have applied different standards of review to decisions involving coal miner pension plans. *See Stepp v. Holland*, No. 5:04-cv-1062, 2005 WL 3088384, at *1 (S.D. W. Va. 2005) (applying abuse of discretion standard); *Peabody Coal Co. v. Dist. 12, United Mine Workers.*, No. 4:03-cv-74, 2004 WL 1378703, at *4 (W.D. Ky. May 17, 2004) (applying standard of review framework found in the Federal Arbitration Act, 9 U.S.C. § 1-16). The court need not decide which standard of review is appropriate, however, because the Trustees' decision clearly satisfies all of the potential standards. Though the abuse of discretion standard is highly deferential, it is less deferential than the standard of review applied to arbitration awards, and the court will apply it in its analysis.

Under the abuse of discretion standard, "a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 341 (4th Cir. 2000). The Fourth Circuit has set out a number of factors that a court may consider when assessing whether a fiduciary has abused its discretion:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they

support it; (4) whether the fiduciary's decision was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Id. at 342-43.

Applying these factors, it is clear that the Trustee's decision was reasoned and not an abuse of discretion. The Trustees' decision is explicitly based on the terms of the 2002 NBCWA and 2002 Employer Plan. (Stip. R. 161-162.) As the Trustees point out, Article XX, Section (c)(3) requires signatory employers to provide health benefits to pensioners for whom the employer was their last signatory employer. (Stip. R. 4.) In order to determine whether Mr. Alderman was a pensioner, the Trustees applied the definition of "pensioner" found in Article I of the 2002 Employer Plan, which defines a pensioner as one who, like Mr. Alderman, receives a pension under the 1974 Pension Plan. (Stip. R. 162-63.) Moreover, it is clear from the record that Long Branch was the last signatory employer for which Mr. Alderman worked. (Stip R. 120.) Thus, the language of the plan supports the Trustees' decision.

In addition, the ROD process was reasoned and principled. Both Mr. Alderman and Long Branch were given the opportunity to make written arguments in support of their respective positions. The Trustees listed these arguments in their opinion and took them into account when reaching their decision. (Stip. R. 160, 163.) They were also careful to make clear the outer limits of their jurisdiction and refused to address arguments that were beyond these limits. (Stip. R. 163.)

Finally, there is no conflict of interest in this case. The four Trustees who made the decision regarding Mr. Alderman's benefits were members of the "Board of Trustees for the UMWA 1993 Benefit Plan." UMWA FUNDS, *Resolution of Disputes ("RODs), What if the Trustees are unable*

-17-

*to resolve the dispute?*, http://www.umwafunds.org/internet/ROD/Rod4.htm (last visited January 10, 2008). "Each board is comprised of four Trustees: two representing the UMWA and two representing the BCOA." *Id.* It is also relevant that the defendants do not challenge the Trustees actual decision; instead, the defendants presented an equitable defense not addressed by the Trustees.

Because the Trustee's decision was the result of a deliberate, principled reasoning process and is supported by substantial evidence, the court must defer to it. The court **FINDS** that the Trustees' February 15, 2006, opinion is a valid and enforceable decision. Because Long Branch has not complied with the Trustees' decision, the court also **FINDS** that Long Branch has breached the NBCWA and has violated Mr. Alderman's rights under ERISA by denying him benefits he was due under the plan. Thus, the court finds that the plaintiffs are entitled to judgment as a matter of law and **GRANTS** the plaintiffs' motion for summary judgment.

**V. Conclusion**

The court **GRANTS in part** the defendants' motion for summary judgment and **DISMISSES** Long Branch Development Co. from the case. Because the defendants have not established that equity bars the plaintiffs claims against them, the court also **DENIES in part** the defendants' motion for summary judgment.

For reasons set forth in greater detail above, the court **GRANTS** the plaintiffs' motion for summary judgment and **ORDERS** the defendants to reimburse Mr. Alderman for all medical expenses incurred since July 1, 2004, that would have been covered by the benefit plan. The court further **ORDERS** the defendants to provide Mr. Alderman with lifetime health benefits as required by the plan.

-18-

The court also **ORDERS** the defendants to pay the reasonable attorneys' fees and costs incurred by the plaintiffs in this action. Finally, the court **DIRECTS** the plaintiffs to file an accounting of attorneys' fees and costs within 30 days. The court will enter a judgment order upon receipt of that information.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:        January 11, 2008

Joseph R. Goodwin, Chief Judge

-19-